Emma M. Sanders v. Commissioner. Estate of Andrew A. Fountain, Deceased, Theola R. Fountain, Executrix v. Commissioner.
Sanders v. Commissioner
Docket Nos. 55341, 55358.
United States Tax Court
T.C. Memo 1957-229; 1957 Tax Ct. Memo LEXIS 21; 16 T.C.M. (CCH) 1041; T.C.M. (RIA) 57229; December 13, 1957
*21 1. The charter of Sanders-Fountain Furniture Co., Inc., expired on December 14, 1942. On December 31, 1942, the only stockholders, directors, and officers of the corporation met and passed a resolution not to renew the charter but to continue the business as a partnership beginning the first day of January 1943. Among the assets distributed by the corporation in liquidation were installment accounts of the face value of $61,178.35. Held, the fair market value of such accounts did not exceed the tax basis of such accounts in the amount of $27,528.51. 2. No deficiencies or additions to the tax are due from the dissolved corporation for the period January 1 to January 2, 1943, and, therefore, petitioners are not liable as transferees. D. R. Cumming, Jr., Esq., and Joseph B. Brennan, Esq., First National Bank Building, Atlanta, Ga., for the petitioners. George W. Calvert, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined that each petitioner was liable as a transferee of property of Sanders-Fountain Furniture Co., Inc., for deficiencies and 25 per cent additions for failure to file returns determied by respondent against *22 the corporation for the taxable period January 1, 1943 to January 2, 1943, in amounts as follows: 25%
Kind of Tax
Deficiency
Addition
Income
$ 10.00
$ 2.50
Declared value excess
profits
2,956.78
739.20
Excess profits
24,544.45
6,136.11 A large number of issues is raised in the pleadings. Petitioners, in their brief, have listed the issues in the order following, with the notation that if the Court should find for petitioners on any issue in the order named, then the Court need not decide the remaining issues. The issues so listed are: (1) Was the corporation, Sanders-Fountain Furniture Co., Inc., liquidated in 1942, as petitioners contend, or on or about January 2, 1943, as respondent contends? (2) Did certain installment accounts receivable of the face value of $61,178.35 distributed by the corporation in liquidation have a fair market value at the time of distribution equal to or less than the basis of such accounts of $27,528.51, as petitioners contend? (3) Is respondent's determination barred by the doctrine of election or estoppel? (4) Is respondent's determination barred by the limitation period prescribed by section 275(g) of the Internal Revenue Code of 1939? (5) Is respondent's determination *23 barred by the limitation period prescribed by section 275(a) of the Internal Revenue Code of 1939? If the Court should decide all of the above issues against petitioners, then three issues remain for our consideration, namely, (a) the determination of the fair market value of the installment accounts at the time of distribution; (b) whether the Commissioner erred in determining a 25 per cent addition to the taxes under section 291(a) of the Internal Revenue Code of 1939; and (c) whether petitioners are liable as transferees. Findings of Fact Sanders-Fountain Furniture Co., Inc., hereafter sometimes referred to as the corporation, was also commonly known as Sanders-Fountain, Inc., and as Sanders-Fountain Furniture Company. The same corporation is intended whenever either name is used or has been used in referring to the business conducted in corporate form. The corporation was chartered under Georgia law on December 14, 1922, for a period of 20 years, and its charter expired on December 14, 1942. No petition for renewal or revivor of said charter was ever filed and the charter was never renewed, revived, or extended by order of any court. Prior to its liquidation, the corporation was *24 engaged in the retail furniture business, selling both new and used furniture, primarily on the installment basis. The corporation reported income from collections on installment obligations under the provisions of section 44 of the Internal Revenue Code of 1939. Petitioner Emma M. Sanders, hereafter sometimes referred to as Sanders, and Andrew A. Fountain (now deceased) hereafter sometimes referred to as Fountain, were the only stockholders, directors, and officers of the corporation in December 1942. At the time of dissolution of the corporation it had issued and outstanding 100 shares of common stock of the par value of $50 per share, constituting the entire capital stock of the corporation, all of which was owned by Sanders and Fountain in substantially equal proportions. On December 31, 1942, the two directors and stockholders of the corporation met and adopted resolutions, the minutes of which are in part as follows: "The charter of the Corporation having expired on December 14, 1942, on motion duly made, seconded and passed it was decided that no application be made for a renewal of said charter. "It was further resolved that beginning the 1st of January, 1943, the business *25 continue as a partnership under the name and style of Sanders-Fountain Furniture Co." The corporation continued to transact business after its charter expired on December 14, 1942. On March 11, 1943, the corporation filed an income and declared value excess profits tax return for the calendar year 1942 and reported income for the period January 1, 1942 through December 31, 1942. On March 15, 1944, a partnership return of income under the name of Sanders-Fountain Furniture Co., hereafter sometimes referred to as the partnership, was filed for the calendar year 1943, in which return income was reported for the period January 1, 1943 through December 31, 1943. In answer to the question on page 4 of the partnership return asking for the date of organization of the partnership, the answer was "January 1, 1943." Upon liquidation of the corporation, the corporation transferred all of its assets and property, both real and personal, to its two stockholders in return for the surrender and cancellation of shares of capital stock in the corporation. Each of the stockholders received an undivided interest in the transferred assets which was proportionate to the percentage of total outstanding *26 capital stock owned by each. Among the assets distributed to the stockholders on dissolution and liquidation of the corporation were all of the accounts receivable held by the corporation on dissolution. The face value of the accounts was $61,178.35. The basis of the accounts was $27,528.51. The year of origin of the accounts was as follows.. Year Account
Balance as
Originated
of 12/31/42
1934
$ 23.00
1935
96.65
1936
161.25
1937
360.00
1938
1,236.28
1939
3,478.80
1940
8,250.06
1941
23,588.77
1941 New Deal *
2,192.30
1942
21,791.24
$61,178.35
On June 20, 1949, the respondent mailed a deficiency notice to the corporation in which he determined that the corporation liquidated and distributed its assets to its sole stockholders on or about January 2, 1943; that the corporation should have filed a corporation income and declared value excess profits tax return on Form 1120 and a corporation excess profits tax return on Form 1121 for the period January 1, 1943 to January 2, 1943; and that there were due from the corporation the deficiencies and additions to the tax now proposed to be collected from petitioners as transferees. *27 In determining the above deficiencies, the respondent determined that the fair market value of the installment accounts receivable distributed in liquidation of the corporation was equal to the face value thereof, or $61,178.35, and that the only income the corporation had for the 2-day period in 1943 was the difference between the $61,178.35 and the basis of such accounts of $27,528.51, or a net income of $33,649.84. No part of the above-mentioned deficiencies and additions to the tax of the transferor corporation totaling $34,389.04 for the period January 1, 1943 to January 2, 1943, inclusive, has been paid. The deficiencies were assessed against the corporation on November 4, 1949. The corporation was liquidated on December 31, 1942. After the liquidation of the corporation and distribution of the accounts receivable to the stockholders, the stockholders in turn contributed those accounts receivable to the partnership composed of the two stockholders of the corporation, Sanders and Fountain. The partnership then continued the business formerly conducted by the corporation. The partnership in its return of income for the calendar year 1943 reported collections made in that year *28 on accounts receivable pertaining to sales made by the corporation during years prior to the year 1943 as follows: Year Sales
Percentage
Made by
of Gross
Gross
Corporation
Amount
Profit
Profit
1936
$ 164.25
51.18
$ 84.06
1937
373.18
53.70
200.40
1938
1,202.00
65.02
781.54
1939
3,332.85
67.80
2,259.67
1940
7,205.00
64.66
4,658.75
1941
16,361.75
62.68
10,255.54
1941 New
Deal
1,405.30
58.00
815.07
1942
18,564.41
40.18
7,459.18
$48,608.74
$26,514.21
The partnership in its return of income for the calendar year 1944 reported collections made in that year on accounts receivable pertaining to sales made by the corporation during years prior to the year 1943 as follows: Year Sales
Percentage
Made by
of Gross
Gross
Corporation
Amount
Profit
Profit
1941
$3,449.85
62.68
$2,162.37
1941 New
Deal
367.35
58.00
213.06
1942
1,923.95
40.18
773.04
$5,741.15
$3,148.47
The partnership in its return of income for the calendar year 1945 reported no collections made in that year on accounts receivable pertaining to sales made by the corporation during years prior to the year 1943. The partners, Sanders and Fountain, reported their distributive shares of the net income of the partnership shown on the partnership returns for the years 1943, 1944, and 1945 on their individual *29 returns for the respective years. The fair market value of the installment accounts in the face amount of $61,178.35 distributed by the corporation at the time of liquidation was not in excess of the tax basis of such accounts in the amount of $27,528.51. The stipulation of facts is incorporated herein by reference. Opinion We have found as a fact that the fair market value of the installment accounts distributed by the corporation in liquidation in the face amount of $61,178.35 was not in excess of the tax basis of such accounts in the amount of $27,528.51. Based on such a finding, we think it follows that the corporation did not realize any gain upon the disposition of such installment obligations under section 44(d) of the Internal Revenue Code of 1939, [1] regardless of whether the liquidation took place in 1942 or 1943, although we have also found as a fact that the corporation was liquidated on December 31, 1942. Since the only income of the corporation determined by the respondent for the 2-day period in 1943 was the difference between the face value and the tax basis of such installment accounts, we think it also follows that if we are correct in our finding that the fair market *30 value of such accounts was not in excess of the tax basis of such accounts, then there could be no tax liability of any kind due from the corporation for the 2-day period in 1943 and, there being no tax liability of the corporation, there can be no liabilities against petitioners as transferees. The corporation sold a very cheap grade of furniture to a very poor class of people. About 25 to 35 per cent of its sales were of used furniture. The markup was generally more than 100 per cent over cost. The terms called for weekly payments of approximately 2 to 3 per *31 cent of the sales price. Typical payments were $1 per week on a $50 sale, and $2 per week on a $100 sale. The average size account was $30 or $35. The corporation made no investigation of the customer's credit standing. Most of the sales were made by "outside" men who acted as salesmen and collectors. These collectors would call on the debtors weekly at their homes or jobs. They received 20 per cent of the amount collected as their compensation. They had to know where the debtors lived and worked, and even their faces and nicknames. It is apparent, we think, that the fair market value of the accounts in question could not equal their face value if a prospective purchaser would have to pay approximately 20 per cent to collect them, in addition to its other expenses. Petitioners offered the testimony of two expert witnesses. Both witnesses were competent, qualified, disinterested, and unimpeached. Both witnesses testified that in their opinion the maximum value which could possibly be assigned to the accounts receivable as of December 31, 1942, or thereabouts, would be 35 per cent of their face value. This is less than the tax basis of such accounts which was approximately 45 per cent. *32 Petitioners' first witness, Ralph Brasswell, had been employed by a chain operator of furniture stores of three Southern States, including Georgia, for 16 years. He testified that furniture accounts receivable were very commonly bought and sold for prices of from 25 to 33 1/3 per cent of face value; that they never went over 35 per cent on accounts like the ones here involved; and that they considered accounts more than 2 years old as having no fair market value whatever. Approximately 22 per cent of the accounts here in question at the face amount of $61,178.35 were more than 2 years old. Royal Terrell had been employed by a chain operating 38 retail furniture stores in about seven Southern States. He also testified that in his opinion the maximum possible fair market value of the accounts in question on or about December 31, 1942, would not be more than 35 per cent of their face value. He emphasized the expense and uncertainties inherent in reliance on outside collecting agents and the losses from "picking up junk merchandise, which is all [in] pieces and really not worth bringing in." Respondent offered no evidence as to the fair market value of the accounts other than the fact *33 that in 1943 and 1944 approximately 90 per cent of the face value of the accounts was collected. This was due largely to the fact that in 1943 and 1944 many of the company's customers had found employment by reason of the war effort in shipyards and war plants with earnings which permitted them to pay when the collectors came around but, on the valuation date, there was no assurance that such favorable conditions would occur. Under all the facts and circumstances here present, we regard such "hindsight" evidence of little value in determining the fair market value on the valuation date. Schnorbach v. Kavanagh, 102 Fed. Supp. 828, 838. We are convinced that the accounts here in question did not have a fair market value on or about December 31, 1942, in excess of their cost or tax basis of $27,528.51. We hold, therefore, that the Commissioner erred in determining any deficiencies or additions to tax against the corporation for the 2-day period in 1943, and that petitioners are not liable as transferees. Decisions of no transferee liability will be entered for the petitioners. Footnotes
*. These were some accounts that the corporation had purchased from one Max I. Halperin in 1941.↩
1. SEC. 44↩. INSTALLMENT BASIS. (d) Gain or Loss upon Disposition of Installment Obligations. - If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1)in the case of satisfaction at other than face value or a sale or exchange - the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange - the fair market value of the obligation at the time of such distribution, transmission, or disposition. * * *